**FT. WORTH, & D. C. RY. CO. et al. v. SMITHERS. (No. 1713.)**

(Court of Civil Appeals of Texas. Amarillo. Dec. 8, 1920. On Motion for Rehearing, Feb. 2, 1921. Rehearing Denied March 2, 1921.)

1. **Master and servant ⬤⟹288(2)—Roundhouse hostler's assumption of risk from slippery cab floor held for jury.**

In action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), for injuries to roundhouse hostler who slipped on the water and grease on the floor of the engine cab, the question of whether he assumed the risk of working in the cab with the floor in wet and greasy condition *held* for the jury.

2. **Master and servant ⬤⟹288(1)—Assumption of risk ordinarily question for jury.**

Ordinarily the question of assumed risk is one of fact for the jury, unless the facts present a situation so plain that intelligent men would not draw different conclusions.

3. **Master and servant ⬤⟹231(1)—Employee may assume that employer has provided safe place and appliances.**

An employee has the right to assume that employer has exercised proper care with respect to providing a safe place to work and suitable and safe appliances for the work.

4. **Master and servant ⬤⟹107(2)—Reasonably safe place required.**

The employer is required to furnish a reasonably safe place in which to work.

5. **Master and servant ⬤⟹291(4)—Instruction on condition of locomotive ash pan held not objectionable.**

In action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), for injuries to roundhouse hostler in descending from engine cab to get under engine to close ash pan, instruction as to condition of ash pan *held* not to submit question of whether railroad failed to install the ash pan required by Ash Pan Act (U. S. Comp. St. § 8624), as against objection that there was no evidence of such failure, but merely to submit issue as to whether the ash pan was in proper repair.

6. **Trial ⬤⟹350(8)—Court should not submit issue where facts are uncontroverted.**

When acts are uncontroverted, or there is no issue as to such facts, the court should so charge, and not submit it as an issue to be found by the jury.

7. **Master and servant ⬤⟹265(4)—Locomotive ash pan presumed to comply with federal act.**

In an action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), for injuries to a railroad employee, caused by railroad's violation of Ash Pan Act (U. S. Comp. St. § 8624), it will be presumed that the ash pan placed on the locomotive complied with the requirements of the statute.

8. **Master and servant ⬤⟹129(5)—Violation of Federal Ash Pan Act (U. S. Comp. St. § 8624) held proximate cause of injuries to roundhouse hostler slipping on cab floor.**

Where a roundhouse hostler slipped in stepping on water and grease on floor of engine cab while descending to ground to go under engine to close ash pan on inability to so do by use of the lever while in the cab, the railroad's failure to keep ash pan in repair, in violation of Ash Pan Act (U. S. Comp. St. § 8624), was the proximate cause of the injury, notwithstanding that he would not have fallen but for the water and grease on the floor of the cab.

9. **Master and servant ⬤⟹110—Federal act held applicable.**

Safety Appliance Act (U. S. Comp. St. §§ 8617–8623), requiring an engine to be equip-

ped with an ash pan which can be dumped or emptied or cleaned without the necessity of an employee going under the locomotive, *held* to protect an employee not only while he is actually under the locomotive adjusting the pan, but also in each and every step necessary to accomplish that purpose.

**10. Master and servant ⬿204(2), 228(2)— Violation of Federal Ash Pan Act (U. S. Comp. St. § 8624) precludes defenses of assumed risk and contributory negligence.**

In an action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), for injuries caused by the railroad's violation of the Ash Pan Act (U. S. Comp. St. § 8624), the railroad could not defend on the plea of assumed risk or contributory negligence, in view of Federal Employers' Liability Act, § 4 (Comp. St. § 8660), and Employers' Liability Act 1908, §§ 1–4 (Comp. St. §§ 8657–8660).

**11. Negligence ⬿136(25)—Proximate cause question for jury.**

The proximate cause of an injury is ordinarily a question for the jury.

**12. New trial ⬿140(3)—Evidence insufficient to show that jury was influenced by suggestion that attorney was to receive one-half of recovery.**

Evidence *held* to justify finding that a suggestion made in jury room, during discussion of amount to be awarded, that plaintiff's attorney was to receive as his fee one-half of the amount recovered, did not influence the amount of the verdict.

**13. New trial ⬿44(3)—Suggestion in jury room that attorney was to receive one-half of recovery held not ground for.**

Where it did not affirmatively appear from the evidence that a suggestion made in the jury room during deliberation as to amount of verdict, that plaintiff's attorney was to receive one-half of the amount recovered as his fee, influenced the verdict, court's denial of new trial on the ground of such suggestion *held* not an abuse of discretion, under Rev. St. art. 2021.

**14. Damages ⬿132(3)—$15,000 verdict for paralysis resulting from injury held not excessive.**

In action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), $15,-000 verdict for injuries to 21 year old employee suffering from paralysis as a result of the injuries, and who had lost more than 40 pounds in weight between injury and trial, *held* not excessive.

**15. Damages ⬿185(1)—Evidence held to show paralysis caused by injuries.**

In action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), for injuries to employee, evidence *held* to warrant finding that the injuries received caused paralysis.

**16. Evidence ⬿11—Judicial notice taken of the abnormal wages and prices paid during years 1917 to 1920.**

The Court of Civil Appeals will take notice that wages and prices during the years between

1917 and 1920 were abnormal, and perhaps should not be looked to as furnishing a future criterion as to earning capacity of a plaintiff suing for injuries, or for comparison as to wages received before and after.

On Motion for Rehearing.

**17. Master and servant ⬿295(7)—Instruction on assumed risk held erroneous.**

In an action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), instruction to find for railroad if employee knew of railroad's negligence, or by the exercise of ordinary care could have known the same while in the discharge of his duties in time, by the exercise of ordinary care on his part to have avoided injury therefrom, *held* erroneous, in that it assumed that employee would not be guilty of assumed risk if with knowledge of railroad's negligence he exercised ordinary care to avoid injury.

**18. Master and servant ⬿217(10)—Railroad employee not relieved of assumed risk by exercising ordinary care to avoid injury from known negligence.**

Railroad employee who knew, or must have known, of railroad's negligence, and continued in the service, could not recover under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), even though with knowledge of such negligence he exercised ordinary care to avoid the injury.

**19. Master and servant ⬿295(7)—Instruction on assumed risk held erroneous.**

An instruction that employee did not assume risk if, with knowledge of defendant's negligence, he exercised ordinary care to avoid injury therefrom, would have been defective under Rev. St. art. 6645, subd. 2.

**20. Appeal and error ⬿750(6)—Assignment of error to refusal of charge held to cover giving of incorrect charge.**

The Court of Civil Appeals will reverse case on ground that an instruction was erroneous, notwithstanding failure to complain thereof by assignment of error, where court refused a proper charge, and such refusal is complained of by assignment of error.

**21. Master and servant ⬿217(20)—Risk not assumed by roundhouse hostler unless careful person would have observed slippery cab floor and appreciated danger.**

Railroad roundhouse hostler did not assume risk of working in cab with wet and greasy floor unless the grease and water and the consequent danger were so obvious that an ordinarily careful person in his situation would have observed the grease and water and appreciated the danger.

**22. Master and servant ⬿288(2)—Roundhouse hostler's assumption of risk from absence of lights held for jury.**

In an action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries to a railroad roundhouse hostler who slipped and fell while descending from cab to ground, in which it was claimed that railroad was negligent in not having furnished lights,

question of whether he assumed the risk from absence of lights *held* for the jury.

**23. Master and servant** ⌘≈286(3)—**Railroad's negligence in not lighting roundhouse premises held for jury.**

In an action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries to roundhouse hostler descending from engine cab to ground, the railroad's negligence in not lighting the premises *held* a question for jury.

**24. Master and servant** ⌘≈285(5)—**Negligent failure to light premises as proximate cause of injuries to roundhouse hostler held for jury.**

In an action against railroad under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), for injuries to a roundhouse hostler who fell while descending from engine cab to ground, question of whether railroad's failure to light the premises was a proximate cause of the injuries *held* for the jury.

**25. Master and servant** ⌘≈285(11)—**Negligence in moving engine as proximate cause of injury to roundhouse hostler held for jury.**

In an action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries to a roundhouse hostler who fell into turntable pit while descending from cab, whether railroad's negligence in moving engine on turntable, over pit, was a proximate cause of the injury, *held* a question for the jury.

**26. Master and servant** ⌘≈285(7)—**Cause of roundhouse hostler's fall from engine held for jury.**

In an action under Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries to a roundhouse hostler who fell in descending from engine cab to ground, whether he slipped on water and grease on floor of cab, *held* a question for the jury.

**27. Negligence** ⌘≈61(1)—**Concurrent cause contributing to injury efficient cause.**

If it required two agencies to produce the injury, or if both contributed thereto as concurrent forces, the presence and existence of one will not exculpate the other, because it would still be the efficient cause of the injury.

Appeal from District Court, Dallam County; Reese Tatum, Judge.

Action by Glenn Smithers against the Fort Worth & Denver City Railway Company and another. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

Thompson, Barwise, Wharton & Hiner, of Fort Worth, Turner & Dooley, of Amarillo, and Tatum & Strong, of Dalhart, for appellants.

Bailey & Richards, of Dalhart, F. P. Works, of Amarillo, and Joseph Gill and D. A. Paddock, both of Clayton, N. M., for appellee.

HUFF, C. J. Smithers brought this action against the Fort Worth & Denver City Rail-

way Company and the Colorado & Southern Railway Company, jointly, for damages alleged to have been occasioned by a fall while in the employ of the appellants. Before the trial court the following agreement was entered:

"It is agreed by and between the parties hereto that at the time of the injury in question both the defendants and plaintiff were engaged in interstate commerce, and it is further agreed that at the time of said injury the plaintiff was in the general employment of the Fort Worth & Denver City Railway Company, and in the special employ of the Colorado & Southern Railway Company."

The appellee Smithers worked for the Fort Worth & Denver City Railway Company in 1916 for about two months as flue borer, the duties of which were connected with the roundhouse at Texline, Tex. Some time in April, 1917, appellee again took employment from appellants as hostler's helper, and continued in that position for about 24 days, until he was injured, and for which he sues in this case. His duties were to help knock out fires in engines, put them on the turntable, and take them into the roundhouse, and such other duties as he was directed to perform under the direction of the hostler. On the evening of April 24, 1917, an engine came in over the C. & S. from Trinidad, Colo., and was turned over by its crew to the hostler and his crew at the roundhouse, about 40 or 50 feet from the turntable. The engine was stopped on what was called the cinder dump track. To keep the cinders from piling up the engine was moved backwards and forwards so as to scatter the cinders until the fire box and ash pan were empty. The appellee and the hostler and another helper went into the engine cab, and the appellee thereupon opened up the ash pan and says they then proceeded to shake the grates. After he got the grates cleaned he tried to close the ash pan, and it would not close from the deck of the cab, and when he found it would not close he started to get out of the cab, with the intention, he says, of putting his shoulder to the lever and from the ground to close it. While in the cab he made considerable effort, by the use of the lever, to close the pan. He says he made about 10 or 12 efforts, and that it would not operate by the lever, and that he then, with the purpose of going under the engine to close the ash pan, started out of the cab. The lever was on the fireman's side of the cab, in front of the fire box, and the fire box is under the engine, and the lever came up into the cab from that box, and the fireman dumped the ashes from the engine by the use of the lever. The lever was about two or three feet up into the cab, and the pan was let down with the lever, which is described again as coming up about to a man's waist. The appellee says the grates

shook all right, but that the pan would not close; it would open, but would not close. When the appellee started to get down he claims his foot slipped in greasy water, and that he fell backward into the turntable pit, which is constructed out of some sort of a hard substance, and that the bottom of the pit from the cab floor was about eleven feet. The water and grease is accounted for by the fact that the engine crew, who brought in the engine from the trip, ate their lunch in the cab, and after getting through washed their dishes with hose attached to the boiler by throwing the water on and over them. The appellee says he knew of this custom of the engine crews. He further stated after he got into the cab he noticed the water, but he did not know there was grease on the floor, but knew of the custom of so washing the dishes. The premises were not lighted and there had been no lights used there during the time of appellee's employment, and he knew there were no such lights. The light on the engine was extinguished, which the appellee knew. He testified he did not know that the hostler had run the engine onto the turntable when he started to get out of the cab, and accounts for his want of knowledge on the ground that he had been busy, trying to close the ash pan with the lever and that there were no lights. He had a coal oil torch when he went into the cab, which he says was blown out by the wind some four or five minutes after getting into the cab. He did not relight the torch or try, because, he says, the wind would have blown it out. He also testified that the custom was not to run the engine onto the turntable until after the cinders, etc., were emptied. The evidence tends to show that appellee fell backward into the pit, and that by the fall his coccyx was broken, and that one of the two bones in his hand was broken or injured. He was sent to the sanitarium by appellants for treatment, where he remained for some six or seven days, and was then discharged. Some time in August, 1918, after the fall, he had partial paralysis, and some of the testimony would authorize a finding that this resulted from the injuries received by the fall, and one physician is of the opinion that it would probably result in total paralysis. However, we will make statement with reference to his injuries more definite in considering the assignment that the verdict is excessive. The appellee, by his petition, alleged that the ash pan on the engine was so constructed as to be operated by a lever projecting into the cab; that this lever failed to work the ash pan from that position, and that thereupon he started down and out of the cab of the engine to go under the engine and close the pan. In connection therewith he alleges that grease and water had been left on the floor of the cab by the engine crew which brought it into the yard. It is alleged, substantially as testified to, that previous to starting out

of the cab he had been busily engaged in trying to work the lever, and did not know that the hostler had moved the engine on the turntable, and that he did not know such facts when he attempted to alight from the engine, and that the premises, turntable, etc., were not lighted; that he stepped into the grease and water, and his foot slipped, and he fell backward into a concrete pit, a distance of about 11 feet, striking the concrete floor on the lower end of his spine; that the coccyx bone was broken, and the bones of his right hand were also broken.

The appellants answered by general denial, assumed risk, and contributory negligence.

The court gave a general charge, and in the fourth paragraph thereof submitted the issue as to a violation of the Safety Appliance Act (U. S. Comp. St. §§ 8617–8623), and in the tenth paragraph submitted the facts authorizing recovery under the Employers' Liability Act (U. S. Comp. St. §§ 8657–8665). The jury rendered a verdict for the sum of $15,000, and judgment was entered in accordance with the verdict.

If the jury found for the appellee under the fourth paragraph of the charge, this would eliminate the question of whether the things set out in paragraph 10 were negligence and the question of assumed risk and contributory negligence; but, as the verdict is a general one, we are unable to determine whether the jury based their verdict on the violation of the Safety Appliance Act or under the Employers' Liability Act. It will therefore be required of us to examine the court's charge presenting both features.

The first, third, fourth, sixth, eighth, and tenth assignments will be considered together, as they each assail paragraph 10 of the court's charge, which is in substance, as follows: If the jury should find from the evidence that appellee, in the discharge of his duties, entered the engine cab, and to empty ashes, etc., from the ash pan, and if there was no light, and it was dark in and around the locomotive and the place where the work was being done, and while he was on the engine appellant's employees ran the engine on the turntable, without the knowledge of the appellee, and that appellant's engineer and fireman had caused water and grease to be on the deck of the cab, and if they found and believed a failure to light the place or the running of the engine on the turntable, or the water and grease on the deck, were negligence, or each of said acts was negligence, and if from the evidence they found appellee, while undertaking to get down out of the deck of the cab, stepped in or on grease on the deck of the cab, and that this caused him to slip and fall, and that he was injured from the fall, and that the injuries were the direct and proximate cause (result) of all or any of the acts of negligence, as alleged in the appellee's petition, to find in his favor, unless they should

find for appellants under instructions thereafter given.

[1, 2] It is asserted by the first assignment that the appellee, by remaining on the engine, after he learned there was water on the floor of the cab, assumed the risk incident thereto. This seems to be based on the testimony that some of the operatives of engines sometimes ate their lunch on the engine and washed the dishes with hot water from the boiler by a hose connected therewith, and that before the injury the appellee noticed the water upon the floor, and that when he started down his foot slipped in the grease or water on the floor, and that he was aware of the custom or practice of so washing dishes. It is doubtless true that appellee may have seen the water on the floor after he entered the cab before he fell. It is not necessarily true that he assumed the danger, or knew, or must reasonably have known, that his foot would slip in endeavoring to alight from the engine; in other words, that he knew of the negligence and the danger from such negligence; the negligence submitted which the jury were required to find, whether there was water and grease on the deck of the cab. The appellee testified he did not know at the time that the apron or deck in the engine cab was greasy as well as wet; however, he did know the custom of the train crews with reference to eating their lunch. Remaining in the cab after learning of its condition it does not occur to us would necessarily charge the appellee with assumed risk. There might be some plausibility if he had entered the cab after he knew of the condition. If it was the duty of the appellant to remove the grease and water, and it had not been done and, before appellee entered into the cab in discharge of his duty, he had learned of such neglect, and the danger if he entered, there would be some ground in charging him with assuming such negligence when he continued his entrance into the cab. Such condition would have been somewhat similar to the circumstances surrounding Barnes in the case of Producers' Oil Co. v. Barnes, 103 Tex. 515, 131 S. W. 531. But learning of this negligence after he had entered, if he decided to abandon the employment he then of necessity would have to leave the cab in some way. It occurs to us that a court would not be justified in charging that as a matter of law, under such circumstances, the appellee assumed the risk. The question was one of fact, and not of law, and was for the jury to determine. Ordinarily, the question of the assumption of risk is one of fact for the jury, unless the facts present a situation so plain that intelligent men would not draw different conclusions. Railway Co. v. De Atley, 241 U. S. 310, 36 Sup. Ct. 564, 60 L. Ed. 1016; Railway Co. v. Hall, 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521; Railway Co.

v. Horton, 233 U. S. 492, 34 Sup. Ct. at page 640, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Railway Co. v. Schaffer, 220 Fed. 809, 136 C. C. A. 413; Bonnet v. Railway Co., 89 Tex. 72, 33 S. W. 334; Railway Co. v. Brooks, 199 S. W. at page 669 (8-11).

[3, 4] "The employee has the right to assume that his employer has exercised proper care with respect to providing a safe place to work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it." The Hall Case, supra, and authorities therein cited. The suggestion by appellant that the condition of the cab was as obvious to appellee as to appellant is entitled to but slight notice. The principles of law, as applied to the duties of the employer and employee, are quite different. The duty was on appellant to provide a reasonably safe place. There was no duty on appellee to see that the place was safe, but, on the contrary, he could act upon the assumption that the employer had done his duty. The danger must be known or be obvious before he can be said to have assumed it. In this case it must have been a question of fact under all the circumstances then surrounding appellee. The trial court gave a charge on assumed risk, and advised the jury to find for appellants if they found the facts sustained the plea of assumed risk in this particular charge of negligence.

The third, fourth, sixth, eighth, and tenth assignments urge that the court erred in submitting the question of failure to have the engine furnished with lights and the premises lighted, and in running the engine on the turntable, because, it is asserted, the appellee assumed the risk without the lights, and because there was furnished a torch which appellee failed to keep lighted and burning, and because such acts were not the proximate cause of the injury. There was no objection or complaint urged to the charge which allowed a recovery on such acts of negligence, further than that the uncontroverted evidence established assumed risk, and that such acts were not the proximate cause. In other words, the charge was not objected to because the several acts were submitted disjunctively. An examination of

the charge will, we think, indicate that the several acts were required to have been found to exist conjunctively, or, rather, concurrently. The mere fact that appellee may have known there were no lights would not defeat his right of recovery if he was caused to slip and fall by grease, the negligent presence of which he did not assume. The various acts—the failure to light, pit, etc.—may have been simply a chain of acts which concurred in the fall and injury. The court does not appear to have submitted a failure to light and going onto the turntable with the engine as independent acts of negligence, authorizing a recovery. As above suggested, these acts were all required to be found before a recovery was authorized, except, perhaps, in the last clause, it is charged "if the injuries were the direct and proximate cause (result) of all or any one of these acts or negligence, as alleged in plaintiff's petition," and also qualified by, "unless you find in favor of defendants under instructions hereinafter given you." As above suggested, no objection was urged to the charge because it authorized a recovery alone on the finding that there was no light or in moving the engine onto the turntable. These acts may have been negligence or not, and yet such as would not authorize a recovery for various reasons, such as assumed risk as to them, or not the proximate cause, yet concurring with the appellants' negligent acts in permitting grease and water on the apron of the cab would contribute to the act of falling as well as to the injury sustained. If the slipping was caused by the negligence of appellants, and it was the effective proximate cause, the fact that other acts of negligence concurred in the injury would not defeat a recovery, as we understand. Railway Co. v. Finklea, 155 S. W. at page 618 (12). Later we will note some of the charges thereafter given, authorizing appellants to recover, to which this paragraph of the charge referred. Also it will be noted the charge authorized a recovery on the ground submitted as alleged. As we interpret the allegations of the petition, it is alleged the moving of the engine onto the turntable over a concrete pit, and the failure to light the premises, were concurring acts of negligence, which induced or brought about the fall and injuries, or excused the appellee in the attempt to alight at the time and place he did; that neither the moving of the engine nor failure to light was the sole or efficient cause of the fall or injury, but as concurring causes or acts. We think it was the purpose of the paragraph to submit these facts as alleged, as is manifested by reference to the pleadings as well as the construction of the charge itself.

The second assignment is based on the refusal of the court to give requested instruction No. 18. This was a charge directing the jury that if appellee knew, or necessarily should have known, of the greasy water on the floor of the cab, and the danger therefrom, to find for the appellants. The charge, we think, was substantially correct, and should have been given if the court did not in his charge cover that issue. The trial court, in the ninth paragraph of his main charge, gave a general definition of assumed risk, and in the eleventh paragraph instructed the jury if appellee knew there were grease and water on the apron in the cab of the engine, etc., to find for defendant. This charge, given by the court, was defective, but, as we construe it, the error was in favor of appellants. It, in effect, charged the duty of ordinary care on the part of appellee to discover the negligence. Such duty does not rest on the appellee, but he can assume that the master has performed his duty. It is only such negligence as is known to him or may be presumed to have been known to him.

Error is also assigned in giving charge No. 9, which is only an abstract charge on the law of assumed risk, and is as follows:

"The plaintiff, when he entered the employ of defendants as a hostler helper, assumed the risk and dangers ordinarily incident to such employment, but did not assume any risk arising from the negligence of the defendants (if any there was), unless the plaintiff knew of such negligence (if any), or in the ordinary discharge of his duties must have known of such negligence (if any) by the exercise of ordinary care on his part to have avoided injury."

It is difficult to determine just the meaning of this charge. The employee does not assume negligence of which he does not know, or which is not so plainly observable that he is presumed to know. One construction of the charge may be that the employee was required to exercise ordinary care to know. If the language of the charge is transposed, it would read:

"Unless the plaintiff knew of such negligence, or by the exercise of ordinary care on his part to have avoided injury, in the ordinary discharge of his duties, must have known of such negligence."

If such is the meaning, it placed a greater burden on the appellee than the law placed. This seems to have been the court's meaning as interpreted by him in the eleventh paragraph, where he seeks to apply the law to the facts, which appellants plead as assumed risk. The court there sought to charge assumed risk as to the lighting of the engine and premises, the running of the engine on the turntable, and to the grease and water on the floor. The trial court gave appellant's requested instruction No. 15, to the effect that the undisputed evidence established that appellee knew the premises, etc., were not lighted, and submitted only if in the dis-

charge of his duties he must have known, or should have known, of the danger, and that, if he did, to find for appellants on that point. By requested charge No. 35, which was given, the jury were instructed if the appellee knew, or must have known, in the discharge of his duties, the engine was on the turntable, and that he knew, or must have known, of the danger, then appellee would be guilty of assumed risk for injuries received on account of the engine being moved on the turntable. It is obvious, we believe, the meaning of the charge complained of, when read in the light of the other charges given, is in substantial accordance with these charges and charge No. 11, and that the several charges are not contradictory of each other. It is not at all probable the law of assumed risk would be misunderstood by the jury if they heard or read the charges given. They would have found thereunder for appellants if appellee knew, or should have known, of the negligence and the danger, or if he could have known thereof by exercising ordinary care. So, in either event, the appellant was not injured by the charge complained of. We may say at this point that the trial court gave appellants specially requested instruction upon every phase of this case. He submitted, as requested, the question as to whether appellants, or its servants, were negligent in permitting grease and water on the engine, in lighting the premises, and in moving the engine on the turntable; whether either act or all were the proximate cause of the injury, by various charges; whether the appellee assumed the risk, or was guilty of contributory negligence in working without lights, in trying to alight, in stepping in the grease, in not relighting his torch, and whether the injury was an accident. From most every conceivable angle the trial court gave the charges requested by appellants, consisting, in all, of some 23 special charges. If the jury failed to get the appellants' theory, it certainly was not occasioned by the trial court's failure to charge as requested.

[5] The seventh assignment assails the fourth paragraph of the charge, on the ground that it placed a greater duty on appellants than that required by law, in that it is not required by the law that a lever extend into the cab of the engine, or that the ash pan should be operated from the cab of the engine. The paragraph substantially instructed the jury that if appellee, a hostler helper, in the performance of his duties as such, went into the cab of the engine for the purpose of dumping cinders, etc., from the ash pan, and that it could not be operated from the cab, and in the performance of his duty he undertook to go down out of the cab for the purpose of cleaning or closing the pan, and that it was necessary for him to go down and go under the engine for the purposes stated, and while he was undertaking to go down he stepped on or into grease which was on the floor of the engine cab, and that he slipped and fell off of the engine, and if they should further find from the evidence that the engine was not equipped with an ash pan so that ashes could be emptied or dumped by operating the lever connected with the cab, and could not be so closed, and that appellee was injured as alleged, and if they found the ash pan was defective so that it could not be operated as stated by the lever from the cab, and if the defects of the ash pan, if any, were the concurring proximate cause of appellee's injuries, to find for him. The Ash Pan Act provides:

"On and after the first day of January, 1910, it shall be unlawful for any common carrier, engaged in interstate or foreign commerce by railroad to use any locomotive to move interstate or foreign traffic, not equipped with an ash pan, which can be dumped or emptied and cleaned without the necessity of an employee going under such locomotive." Section 8624, U. S. Compiled Stats.

The act further provides a penalty for failure to comply with the requirements of the act. It was also made the duty of the Interstate Commerce Commission to enforce the provisions of the act. The appellee pleaded in this case that the ash pan in question had been designed and was worked and operated only by use of a lever extending into the cab without the necessity of going under the engine to clean or close the pan. The uncontroverted evidence is the ash pan was constructed as alleged, and there is no evidence that it could be worked in any other way or from any other position.

[6] It is the rule in this state when the facts are uncontroverted, or there is no issue as to such facts, the court should so charge, and not submit it as an issue to be found by the jury.

[7] The law required the engine to be so equipped and it was made the duty of the Interstate Commerce Commission to enforce the law. When the appellant placed such appliance on its engine the presumption should prevail that it was such as the law designated, and the trial court had the right, as we believe, to assume that the ash pan, with the lever, was designed to comply with the law. The only issue was whether it was in such repair as fulfilled the duty of appellants under the law, and this issue was left for the jury to determine.

[8] The thirteenth assignment assails the fourth paragraph because the court therein submitted to the jury the question as to whether the defective working of the ash pan was the concurring, proximate cause of the injury, in that the undisputed evidence shows that the stepping into grease and water was the proximate cause of the fall and injury. This assignment is based upon the objection to the court's charge as filed at the time of the trial. If the ash pan was not working

or defective, as we understand the law, a jury would be authorized to find therefrom that the appellants failed to equip the engine with an ash pan which could be operated without the necessity of the employee going beneath the locomotive. Railway Co. v. Parker, 242 U. S. 56, 37 Sup. Ct. 69, 61 L. Ed. 150; Railway Co. v. Wagoner, 241 U. S. 476, 36 Sup. Ct. 626, 60 L. Ed. 1110.

[9] It has been suggested by argument filed separate from the brief, as well as by oral argument, that the Safety Appliance Act would not apply to the facts in this case, for the reason that the statute requiring an engine to be equipped with an ash pan, "which can be dumped or emptied and cleaned without the necessity of an employee going under such locomotive," in that the employee in this case was not hurt while under the locomotive, but was simply caused to fall on his way to adjust the pan under the engine. To hold with this contention would, it seems to us, be too restricted. The law evidently intended to protect the employee from injury received not only while he is actually under the locomotive, adjusting the pan, but in each and every step necessary to accomplish that purpose, or while he is in the performance of his duty. We believe we may be justified in this holding by the case of Railway Co. v. Layton, 243 U. S. 617, 37 Sup. Ct. 456, 61 L. Ed. 931, where the Supreme Court had under consideration the statute requiring railroads to equip their cars with automatic couplers. The contention was made in that case that the act was not applicable because it was intended only for the benefit of the employees injured when between the cars for the purpose of coupling or uncoupling them. This claim is based upon the expression in the statute, "without the necessity of men going between the ends of the cars." The court there said:

"While it is undoubtedly true that the immediate occasion for passing the laws requiring automatic couplers was the great number of deaths and injuries caused to employees who were obliged to go between cars to couple and uncouple them, yet these laws as written are by no means confined in their terms to the protection of employees only when so engaged. The language of the acts and the authorities we have cited make it entirely clear that the liability in damages, to employees for failure to comply with the law, springs from its being made unlawful to use cars not equipped as required, not from the position the employee may be in, or the work which he may be doing at the moment when he is injured. This effect can be given to the acts, and their wise and humane purpose can be accomplished only by holding, as we do, that carriers are liable to employees in damages whenever the failure to obey these safety appliance laws is the proximate cause of injury to them when engaged in the discharge of duty."

The ruling of the Supreme Court in the above case we think applies with equal force to this. Indeed, by its terms the ruling is made to apply to any of the safety appliance laws, one of which is the Ash Pan. Law.

[10] It does not appear to be a contention in this case that section 4 of the Employers' Liability Act is not applicable to the Ash Pan Law. Compiled Statutes 1916, par. 8660, provides:

"That in any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

This statute is invoked by the appellee, and clearly applies, if the defective ash pan contributed to his injuries. Railway Co. v. Donaldson, 246 U. S. 121, 38 Sup. Ct. 230, 62 L. Ed. 616, Ann. Cas. 1918C, 581. Neither is it asserted that the various provisions of the Employers' Liability Act of 1908, as amended April 5, 1910, pars. 1–4, inclusive (Compiled Statutes 1916, pars. 8657–8660, inclusive), do not apply to this case. These statutes, in effect, gave a right of action to an employee suffering injury "resulting, in whole or in part," from any defect or insufficiency in the carrier's appliances, and that an employee who may be injured shall not be held to have been guilty of contributory negligence where there is a violation of any statute enacted for the safety of employees, which contributed to the injury. The same provision applies to assumed risk. Railroad Co. v. Otos, 239 U. S. 349, 36 Sup. Ct. 124, 60 L. Ed. 322; Railway Co. v. Lindsey, 233 U. S. 42, 34 Sup. Ct. 581, 58 L. Ed. 838, Ann. Cas. 1914C, 168; Railway Co. v. Huxoll, 245 U. S. 535, 38 Sup. Ct. 187, 62 L. Ed. 455. We take it, therefore, if there was a defect in the ash pan, which in whole or in part caused the injury or contributed to it, that such defect imposed an absolute liability, and that appellants cannot defend on the plea of assumed risk or contributory negligence. If there was contributory negligence the damages could not be diminished thereby. Authorities above cited. The question presented by the assignment is presented as a question of law for our determination, in which we are requested to hold that there was no evidence authorizing the trial court to submit the issue to the jury as to whether the defect was the proximate cause or concurring cause of the injury.

[11] "The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it." Railway Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256; Ry. Co.

v. Rowe, 224 S. W. 928. We believe the rule which should guide the court in considering this case, under the surrounding circumstances, is stated by the Supreme Court in speaking of the concurring negligence of two parties contributing to the injury:

"This is an attempt to separate that which upon the facts * * * ought not to be separated. The so-called two negligent acts were, in fact, united in producing the result, and they made one cause of concurring negligence on the part of both companies. They were, in point of time, substantially simultaneous acts and parts of one whole transaction, and it would be improper to attempt a separation in the manner asked for by the counsel for the Horse Car Company." Railway Co. v. Hickey, 166 U. S. 523, 17 Sup. Ct. 661, 41 L. Ed. 1101.

The vice, as said in that case, is that counsel attempted a separation into two distinct causes (remote and proximate) which in reality was one continuous cause. The facts in that case show the driver of the horse car drove his car upon the track of the steam railway in front of a fast moving train. The railway company opened its gates, and permitted the horse car to enter, and then lowered them, shutting in the horse car on the track; then raised it, but too late to prevent a stampede of the passengers on the horse car, and the consequent injuries to the complainant. The gist of counsel's argument for the horse car company was that the lowering of the gate was the proximate cause. The steam railway sought to escape liability on the theory that it was the driving of the horse car on the track. The Supreme Court said:

"The act of the driver being a negligent act, and that act being in full force and in the very process of execution at the time the accident occurred, which accident would not have happened but for such negligent act, the fact that another negligent act of a third party contributed to the happening of the accident would not absolve the Horse Car Company. The negligent act of the horse car driver joined with and became a part of the other act in wrongfully lowering the gates, as described, and both acts constituted but one cause for the commotion which naturally resulted therefrom, and on account of both of these acts, as parts of a whole transaction, the injury occurred."

The appellants in their argument quote from the case of Insurance Co. v. Tweed, 7 Wall. 44, 19 L. Ed. 65, what is said as the most satisfactory criterion in ascertaining the proximate cause; that is, where a new cause intervenes. The Hickey Case, supra, quotes that case, and calls attention to the fact that in a sense there was a new force or power which intervened. An explosion occurred in one building, and caused a fire in another building, and from the latter building to the building of the insured, and not from the building in which the explosion occurred. It was claimed by the insured that

the fire in the building was not caused by the explosion. The court, however, held the contention was not well founded.

"It is universally agreed that the mere fact that the intervention of a reasonable human being can be traced between the defendant's wrongful act and the injury complained of will not absolve him. On the contrary, the general rule is that whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary course of events, though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause were set in motion by the original wrongdoer, or was in reality only a condition on or through which the negligent act operated to produce the injurious result." Volume 22, R. C. L. "Proximate Cause," par. 19, p. 134.

In the case of Insurance Co. v. Boon, 95 U. S. 117, 24 L. Ed. 395, cited by appellants, it is said:

"The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental, are instruments of a superior or controlling agency, are not proximate causes and the responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster."

See, also, The H. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234.

In recent cases considered by the Supreme Court, where the cause of the injury was claimed to have resulted from defective appliances, the court refused to allow the defenses of assumed risk or contributory negligence, or to demand proof of negligence, where the negligence of the employee necessarily set other causes in operation, if the defect complained of contributed to the injury or death the carrier was held liable. Railway Co. v. Huxoll, 245 U. S. 535, 38 Sup. Ct. 187, 62 L. Ed. 455; Railway Co. v. Campbell, 241 U. S. 497, 36 Sup. Ct. 683, 60 L. Ed. 1125. It is stated in the latter case:

"It is too plain for argument that under this legislation the violation of the Safety Appliance Act need not be the sole efficient cause, in order that the action may lie."

Where a violation of the Safety Appliance Act set in operation causes which resulted in injury, but the negligence of the employee intervened, through which act he slipped and caused his foot to be mashed, it was held the defective appliance concurred and gave the right of action therefor. Railway Co. v. Wagner, 241 U. S. 476, 36 Sup. Ct. 626, 60 L. Ed. 1110.

Our own state courts have held repeatedly that the cause of an injury need not be the sole cause, but may be a concurring cause. In an action against a city for injuries caused by falling of a pile of lumber (which was

piled in the street) on a child who was playing near it, the immediate cause of the fall of the lumber was by a drayman who struck it with his dray, and this caused the lumber to fall and injure the child. In that case it was held a question for the jury to determine if the city's negligence in permitting the lumber to be so piled was the proximate cause. Gonzales v. City of Galveston, 84 Tex. 3, 19 S. W. 284, 31 Am. St. Rep. 17; Shippers, etc., v. Davidson, 35 Tex. Civ. App. 558, 80 S. W. 1032; Railway Company v. Sweeney, 14 Tex. Civ. App. 216, 36 S. W. 800; City of Lubbock v. Bagwell, 206 S. W. 371. In the Kellogg Case, supra, it was said:

"The inquiry must * * * always be whether there was any intermediate cause disconnected from the primary fault, and self-operating, which produced the injury."

It seems to us the jury may well have found that appellants must have reasonably anticipated the probability of falling under circumstances like the present one, and if grease and water were permitted on the floor of the cab, over which the helper must pass in the performance of his duty, it was probable that an unwary step would participate him into dangerous places. Whether appellant should have reasonably anticipated this particular grease upon the floor, or any other, yet they must have known at all times there was a reasonable probability of a sudden and unforeseen situation being presented which would cause the fireman or helper to fall in going to or from a work which should have been done otherwise than by going under the locomotive. We do not believe the grease on the floor, into which appellee stepped, to be "disconnected from the primary fault," or that it was "self-operating, which produced the injury." The grease on the floor is no more an efficient agency, causing the foot of appellee to step into it and slip, than was the wrong which induced him to take that step. The grease is not an independent cause, operating between the wrong and the injury, but it is a concurring cause. The step in the grease is the same step induced to be taken by the first wrong. They were not separate, but one, in an unbroken sequence of acts to the injury.

[12, 13] Under the eleventh assignment the appellants assert the trial court abused his discretion in refusing a new trial on account of the misconduct of the jurors in receiving statements or evidence to the effect that, out of whatever judgment should be awarded appellee, his attorneys would receive one-half as attorneys' fees, and that said amount was included in their verdict. Three jurors were examined upon the hearing of this ground of the motion. Two of them state they heard something stated about the attorneys receiving compensation out of the judgment, but they paid no attention to it, and that the matter was not discussed. They fixed their verdict on the condition of the appellee and the testimony, and under the charge of the court; that, while they did not read the charge after retiring from the jury box to consider their verdict, they heard the charge read by the court, and the attorneys read and discussed the charge in argument before them. One juror, Mr. Douglas, testified, that the attorneys' fees were discussed in arriving at the amount of the verdict; that he understood, in order to ascertain the amount the appellee would recover, the fees the attorneys would receive, which would be deducted, and leave the balance as net sum of appellee's recovery. "If we gave him $15,000 he would get $7,500.00." This juror, however, stated in his testimony he thought appellee entitled to more than the verdict allowed, and that he voted for a greater amount. This juror also stated: "In arriving at the judgment for $15,000, took into consideration the boy's physical condition as I saw it, and arrived at that under instructions as the jury heard the court give them." Again: "In forming my verdict and the amount I voted for, I tried to base it on what plaintiff and the witnesses testified to and the testimony. I tried to take it all together. We had the court's charge; we did not read it; it had been read, I don't know as it had been read in the jury room; they talked about it. I don't know as any particular part of it was discussed." Mr. Adams, one of the jurors, says he paid no attention to the remark about attorneys' fees, and did not consider it, and knew that several others did not. Some of the jurors voted for as high as $35,000, and the verdict was less than Douglas thought it ought to have been. The evidence on this motion indicates that the statement that the attorneys might get one-half was a bare surmise, as no one pretended to know it as a fact. In the condition of the record, we think the trial court was justified in finding that the evidence did not affirmatively show that the suggestion in the jury room as to attorneys' fees influenced the amount of the verdict. We would not feel justified in holding that it affirmatively appears that the suggestion so influenced the verdict, and that it is manifest therefrom that the trial court abused the discretion vested in him by the terms of the statute. Article 2021, R. S. C.; Railway Co. v. Gray, 105 Tex. 42, 143 S. W. 606; Marshall, etc., v. Scharnberg, 190 S. W. 229; Gulf States Tel. Co. v. Evetts, 188 S. W. 289; Railway Co. v. Roberts, 196 S. W. 1004; Railway Co. v. Andrews (Com. App.) 206 S. W. 823; Railway Co. v. Blalack, 128 S. W. 706; Fox v. Railway Co., 186 S. W. 852; Railway Co. v. Cook, 214 S. W. 539; Hines v. Parry, 227 S. W. 339, by this court (not yet [officially] published).

[14, 15] The twelfth assignment assails the verdict as being excessive. If the appellee is suffering from paralysis, as the evidence authorized the jury to find, we could not say the verdict is excessive. The complaint

seems more to be that at this time or at the trial the appellee was not so afflicted. This we cannot hold as a matter of law.. He was sent to a sanitarium, and there the bones of the lower extremity of his backbone were shown to have been fractured, and were set. The appellee describes the operation with some minuteness, and that Dr. Saunders, who performed the operation, called in a class of students to the operating room, and pointed out to them the fractures, dislocation, etc. This operation is not denied or contradicted by Dr. Saunders, who in fact was not a witness in this case. It is true after appellee was discharged, and before paralysis came on, he performed various services, such as washing car windows; he drove a delivery wagon and a dray; did other work about machinery, and worked on a ranch; rode horseback, and helped with cattle, and also cultivated some land on the ranch. This, however, was all within the interim between the injury and the paralysis, during the period of some eight or ten months. At the end of that time he was suddenly partially paralyzed in his feet, legs, and hands and he described certain premonitory symptoms. It does not appear to be a disputed fact that he was then so afflicted. He was, at that time, again taken to a sanitarium, and the doctors apparently all agreed that he was partially paralyzed, or that he had no control over his limbs, or but very little. The only controversy appears to be whether it was from the injury received at the turntable pit or from some other cause. The appellee swears there was no other cause. The doctors disagree as to whether his condition could have resulted from such injury as described in the testimony. The jury have resolved this doubt in appellee's favor. It seems after the first attack of paralysis he in a measure recovered sufficiently to drive a motor transfer, and for such service obtained fairly good wages, but, if the appellee is to be believed, he cannot walk except when in danger of falling. At the time of the injury he was about 21 years old, and at the trial about 25. He had a life expectancy of about 40 years. He had, before his injury, a chance for advancement in the service in which he was then engaged. Dr. McMillan, who examined the appellee, testified:

"The history of such cases is for paralysis to progress, and then there may be a stationary period, and may be improvement for a length of time, but eventually the case grows worse, and in many cases the result is total paralysis. I believe this to be a typical case."

The appellee before the injury weighed from 173 to 176 pounds, but had been reduced to 130 or a little more. As we understand his testimony, his limbs have shrunken to some extent, and it appears that some sort of exhibition of their condition was made before the jury. While the wages which he has received in some of his employment have been as much or more than he was receiving at the time of his fall, there is some evidence, however, that wages in the service in which he was then employed have increased.

[16] We believe we may take notice of the fact that wages and prices during the years covered by the evidence have been abnormal, and perhaps should not be looked to as furnishing a future criterion as to his earning capacity, or for comparison as to wages received before and after. We do not feel justified, under all the facts in this case, in saying the jury assessed his damages at an excessive amount. If his condition is as described it is serious, and to place our judgment in this case over that of 13 others who say, after they heard all the evidence and saw the witnesses as they testified, that he has been damaged in that sum, would be to assume a right we do not feel justified in exercising under the evidence in this case.

Affirmed.

### On Motion for Rehearing.

[17-19] We have concluded we were in error in holding paragraph 11 of the court's charge sufficiently submitted the issue of assumed risk as to the grease and water, and in holding there was no reversible error in refusing requested charge 18, of which complaint is made under the second assignment of error. In charge 11 the jury were told, if "plaintiff knew there was grease and water on the apron in the cab of said engine, or by the exercise of ordinary care could have known the *same while in the discharge of his duties, in time, by the exercise of ordinary care on his part, to have avoided injury therefrom*," in such event the jury were instructed to find for the defendants. The limitation placed on the charge italicized confused, we think, assumed risk and contributory negligence. If he knew, or must have known, of the negligence and the danger, and continued in the service, this would defeat liability under the Federal Employers' Liability Act. It is probable that the trial court had in mind, in drafting this charge, article 6645, subdivision 2, R. C. S. Under the federal act there is no such limitation, but the common-law rule prevails. This charge, however, under our statutes, would have been defective. A very similar charge to this was condemned and held reversible error by our Supreme Court. Railway Co. v. Hodnett, 106 Tex. 190, 163 S. W. 13; Railway Co. v. Miller, 201 S. W. 1049 (7, 8); Railway Co. v. Winkler, 179 S. W. 691 (4, 7). In the Hodnett Case Judge Phillips said:

"That part of the charge which instructed the jury that the plaintiff would not be held to have assumed the risk if they believed that a person of ordinary care in his situation would have continued in the service with knowledge

of the defect, was erroneous, since the test provided by article 6645 for determining whether in such case the risk is assumed, is not whether a person of ordinary care would have continued in the service with knowledge, simply, of the defect, but whether such a person would have continued in the service with knowledge both of the defect and the danger."

It will be perceived the question of knowledge of the danger was not submitted. While the Hodnett Case is one construing our statute, and which in effect holds the statute does not abrogate assumed risk in this state, it is nevertheless authority on the necessity of giving a correct charge on the law. We do not believe that an employee is relieved of assumed risk by ordinary care to "avoid injury" from the defect. The danger which charges knowledge must be such that "an ordinarily prudent person, under the circumstances, would have appreciated it." Railway Co. v. Hall, 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521. Our state courts have said:

"The servant owes no duty of inspection. He assumes the risk of a danger of which he has actual knowledge, and of such hazard as he would have learned by the exercise of that ordinary circumspection which a prudent man would have used in the particular employment."

He could not shut his eyes to dangers that are obvious to an ordinarily prudent man. Railway Co. v. Hynson, 101 Tex. at page 546, 109 S. W. 929; Bonnett v. Railway Co., 89 Tex. 76, 33 S. W. 334. The charge, it appears to us, assumed if the appellee knew, as an ordinarily prudent man must have known, of the hazard he would not be guilty of assumed risk if he exercised ordinary care to "avoid injury therefrom." When he knew of the hazard he takes the risk, however careful he may be to avoid injury. Under the facts of this case the jury could have found very properly that appellee knew of the grease and water, but that he did not know the danger in remaining on the engine, and in attempting to continue in the discharge of his duties under the peculiar circumstances then surrounding him. It will be perceived by the charge the court only authorized the inquiry as to whether he knew of the water and grease, and did not require them to ascertain if he knew, or should have known, the danger. Obviously this was the important fact to be found. The effect of the charge is as if the court had said, "If you find he knew of the grease and water, you need find only that he used ordinary care in time to avoid injury therefrom." They, under this charge, could find he knew of both the defect and the danger, but that they could not find for appellants if appellee used care to avoid injury. Railway Co. v. Bryant, 8 Tex. Civ. App. 134, 27 S. W. 825: Railway Co. v. Bingle, 9 Tex. Civ. App. 322, 29 S. W. 674.

[20] For the reasons above stated we were in error in overruling the fifth assignment of error assailing the ninth paragraph of the court's charge. We were under the impression that the eleventh paragraph, which sought to apply the law to the facts, simply placed the burden on appellee of ordinary care to discover the defect, which was more onerous to the appellee than the law required. We are now convinced by these charges the jury were authorized to acquit appellee of assumed risk, even if he knew of the defect and hazard, if he used ordinary care to avoid injury therefrom. There is no assignment assailing charge 11, but as a substantial correct charge was requested, and an assignment asserting error in the failure to give the requested charge is presented, perhaps, under our practice, it was sufficient to have called the trial court's attention to the defect, and will authorize a reversal upon that point.

[21] The first assignment simply asserts there was error in submitting whether there was grease and water in the cab because the undisputed evidence established that appellee assumed the risk, not that the evidence was not sufficient to show its existence, or that it was not negligence on the part of appellant to permit it so to remain. We think the evidence presented an issue of fact for the jury, and not one of law under the circumstances of this case. Even though he discovered water and grease as he entered, which the facts do not conclusively show, but rather he did not discover until he entered the cab, and the facts also indicate he was not then aware of the defect in the lever to the ash pan or the necessity of going beneath the engine to adjust it. Unless this grease and water, and the consequent danger, were so obvious that an ordinarily careful person, in his situation, would have observed the one and appreciated the other, then there would be no assumed risk. Without discussing further the facts, we think, under the circumstances, it was one for the jury. Railway Co. v. De Atley, 241 U. S. 310, 36 Sup. Ct. 564, 60 L. Ed. 1016.

[22] The third assignment is based on the objection to submitting the issue of lighting the engine and premises because it is asserted the appellee assumed the risk of no lights. Again, we think, as to the danger therefrom, the question was one for the jury under all the facts.

[23] With reference to the fourth assignment, it is asserted that furnishing a torch which appellee permitted to be blown out, and which he did not relight, rendered it error to submit the issue of negligence as to lighting the premises. This, we think, was an issue for the jury.

[24-26] The sixth assignment asserts error in submitting a failure to light the premises as a proximate cause, and the eighth assignment, that moving the engine on the turn-

table over the pit was not the proximate cause of the injury, and the tenth assignment that the evidence is not sufficient to show that appellant stepped in grease and water, which caused the fall. Appellee fell, and the jury found that it was not an accident under appellant's specially requested instruction. We are inclined to the opinion that the evidence was sufficient to submit the question to the jury for their determination. If we shall concede that appellants' interpretation of paragraph 10 is correct, yet we are not prepared to say, if the jury found one of the alleged acts of negligence was the proximate cause of the injury, that such finding would be without any evidence to support the verdict; or, in other words, that such act should not be submitted because it could not, under the rules of legal logic, be the proximate cause. We believe a jury may have found any one of the acts negligence, and acting in conjunction with other acts, whether such other acts were negligence or not, they could have found the injury proximately resulted therefrom if the injury would not have occurred but for the particular negligent acts so found. We think the court would not have been authorized in withdrawing any of the acts from the jury, and certainly if they were all negligent acts, and concurring with each other, and caused the injury, the court should not have withdrawn all from the consideration of the jury.

Assignment 13, assailing the fourth paragraph of the charge, presenting appellee's cause of action, as based on the Federal Safety Appliance Act, is assailed by appellants as being error. It is asserted by the assignment that the defective ash pan was not, and could not be, the proximate cause. We may say appellants, by their argument and citation of numerous authorities, have not changed our view as expressed in the original opinion.

"In cases in which there is more than one cause or act connected with or concerned in producing the injury, the books are full of discussions determining which one of the causes or acts was the proximate cause. As a result of the infinite variety of cases presenting this question, it is easy to find authority that will apparently support each side in almost any controversy in which a doubtful question arises. To attempt to reconcile these cases would be the height of folly. In truth, when carefully studied, there is really little conflict between them. The apparent conflict grows out of the difference in facts, to which must be applied the principle that controls." City of Louisville v. Hart, 143 Ky. 179, 136 S. W. 215, 35 L. R. A. (N. S.) 207.

"The negligent act or omission must be the cause which produces the injury, but it need not be the sole cause, nor the last or nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which, in combination with it, causes the injury, or if it sets in motion a chain of circumstances, and operates on them in a continuous sequence, unbroken by any new or independent cause. The question is not determined by the existence or nonexistence of intervening events, but by their character, and the natural connection between the original act or omission and the injurious consequences. * * * It is not necessary that the person guilty of a negligent act or omission might have foreseen the precise form of the injury; but, when it occurs, it must appear that it was a natural and probable consequence of his negligence. If the negligence does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent independent act of a third person, the two are not concurrent, and the existence of the condition is not the proximate cause of the injury. Where the intervening cause is set in operation by the original negligence, such negligence is still the proximate cause, and where the circumstances are such that the injurious consequences might have been foreseen as likely to result from the first negligent act or omission, the act of the third person will not excuse the first wrongdoer. When the act of a third person intervenes, which is not a consequence of the first wrongful act or omission, and which could not have been foreseen by the exercise of reasonable diligence, and without which the injurious consequence could not have happened, the first act or omission is not the proximate cause of the injury. The test is whether the party guilty of the first act or omission might reasonably have anticipated the intervening cause as the natural and probable consequence of his own negligence, and, if so, the connection is not broken; but if the act of the third person, which is the immediate cause of the injury, is such as, in the exercise of reasonable diligence, would not be anticipated, and the third person is not under the control of the one guilty of the first act or omission, the connection is broken, and the first act or omission is not the proximate cause of the injury." Seith v. Commonwealth Electric Co., 241 Ill. 252, 89 N. E. 425, 24 L. R. A. (N. S.) 978, 132 Am. St. Rep. 204.

We quote from the above case the rules for determining the proximate cause, and not because the facts in that case are similar to the facts of this case. In this case there was no intervening negligent act of a third party. The defect in the ash pan did not simply furnish the condition, but the grease and water more nearly answered to that position. The intervening object in this case was set in motion by the original defect, and acting in conjunction with the grease and water produced the injury. Unless there was an intervening agency between the defect in the ash pan lever and the injury, we apprehend there would be no contention that it was not the proximate cause of the injury. The mere fact that the injury would not have happened but for the slip does not necessarily make the grease and water the sole cause of the injury. If the injury would not have occurred but for the defective lever and the slip, then both

are the proximate cause. If the testimony of appellee is true, he, but for the defect, would not have tried to leave the cab when he did, and but for that he would not have fallen at that time. The mere fact that he slipped on the road to adjust the ash pan did not break the causal connection, but was only a concurring cause, and was not an independent, intervening cause. The grease and water simply lay in wait, to be brought into active operation by the cause which induced appellee to leave the cab. Certainly the cause which called into action the grease and water gave its efficiency at the time for harm.

"Intervening agencies sometimes interrupt the current of responsible connection between negligent acts and injuries, but, as a rule, these agencies, in order to accomplish such result, must entirely supersede the original culpable act, and be in themselves responsible for the injury, and must be of such a character they could not have been foreseen or anticipated by the wrongdoer. If it required both agencies to produce the result, or if both contributed thereto as concurrent forces, the presence and assistance of one will not exculpate the other, because it would still be the efficient cause of the injury." Shippers Co. v. Davidson, 35 Tex. Civ. App. 558, 80 S. W. 1032; Railway Co. v. Cardwell, 187 S, W. 1073; Pullman Co. v. McGowan, 210 S. W. 847; City of Louisville v. Hart, 146 Ky. 171, 136 S. W. 212, 35 L. R. A. (N. S.) 207.

[27] The last above quotation is from the Court of Civil Appeals, but it cites very high authority. It presents, we think, the rule of concurrent acts clearly and understandably, without any attempt at subtle refinements. In this case there was no independent employer committing a different act at a different time and place. The injury is the result of the negligence of the same superior. Be the acts one or more, these several acts concurred at the same place and at the same time. We do not think the line of cleavage between the two acts is so plainly discernible as to make them independent and separate acts, and the latter intervening, which alone caused the injury. They were in action at the same place at the same time, through the fault of the same superior, by which the injury resulted. The injury might have occurred without the grease and water, but the grease and water would not have been brought into operation at the time and place it was but for the defect which impelled appellee to pass over it.

The other assignments we think properly disposed of in the original opinion. Some of the matters perhaps will not occur on another trial. The motion for rehearing will be granted, and the judgment of affirmance ordered set aside, and the judgment of the trial court reversed, and the cause remanded for another trial.